UNITED DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

DONNA CONWAY,                         )
                                      )
          Plaintiff,                  )
                                      )
vs.                                   )          Case No. 4:05CV02296 JCH (AGF)
                                      )
JO ANNE B. BARNHART,                  )
Commissioner of Social Security,      )
                                      )
          Defendant.                  )

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This action is before this Court for judicial review of the final decision of the

Commissioner of Social Security denying Plaintiff Donna Conway's application for

disability insurance benefits under Title II of the Social Security Act (SSA), 42 U.S.C.

§§ 401-434. The action was referred to the undersigned United States Magistrate Judge

under 28 U.S.C. § 636(b) for recommended disposition. For the reasons set forth below,

the Court recommends that the decision of the Commissioner be reversed and the case

remanded.

Plaintiff, who was born on December 22, 1956, filed her application for benefits

on March 5, 2002 (with a protective filing date of February 6, 2002), claiming a disability

onset date of May 2001, due to seizures and the effects of anti-seizure medication that

made her forgetful and drowsy. After her application was denied at the initial

administrative level and upon reconsideration, Plaintiff requested a hearing before an

Administrative Law Judge ("ALJ").  A hearing was held on May 21, 2004, after which

the ALJ determined, on November 22, 2004, that Plaintiff was not disabled because she

could return to her past work as a bank teller or bank customer service representative.

On March 17, 2005, while her request for review was pending before the Appeals

Council of the Social Security Administration, Plaintiff wrote to the Council that she had

been misdiagnosed until recently, and that following surgery on January 7, 2004, for a

ruptured eardrum, and then treatment for an ear infection, her problems had resolved.

Plaintiff wrote that her seizures had "decreased markedly" since her ear infection had

been partially treated in November 2004.  Plaintiff amended her application to seek a

period of disability from November 2001 through February 1, 2005.  Tr. at 316-17.  The

Appeals Council summarily denied Plaintiff's request for review.  Tr. at 10-13.  Plaintiff

has thus exhausted all administrative remedies and the ALJ's decision of November 22,

2004, stands as the final agency action.

Plaintiff argues that the ALJ's decision is not supported by substantial evidence.

Specifically, Plaintiff argues that there is no medical evidence to support the ALJ's

assessment of Plaintiff's residual functional capacity ("RFC"); that the ALJ failed to

consider the report of a consultative mental health expert, after ordering such an

examination; failed in his duty to develop the record; did not consider Plaintiff's

subjective complaints under the proper standard; and did not analyze the mental demands

of Plaintiff's past work; and that the Appeals Council did not examine new and material

evidence submitted to it.

# BACKGROUND

## Medical Record

The earliest medical documentation in the record of Plaintiff's seizures is dated June 27, 1998, when she came to a hospital emergency room with a friend due to a "generalized seizure" followed by a period of confusion. Plaintiff reported that she had had three to four witnessed seizures in the past, that she had seen a neurologist, and that an MRI and an EEG were both negative. She also reported that for the past two years, she had no longer been taking medications for seizures. Plaintiff was discharged with directions to eat regularly and to follow up with her regular physician. Tr. at 118-20.

Plaintiff was seen at two different emergency rooms on August 5, 1998. She was brought to one emergency room by paramedics after she passed out at work. Plaintiff reported that she had sustained a head injury (without loss of consciousness) when she fell at home about six years earlier. She also reported episodes of feeling weak and passing out in the past. She stated that work had been stressful, that she had skipped lunch, and that she felt her hand jerk and then apparently fell to the floor. It was noted that Plaintiff was taking Buspar, an anti-anxiety medication. Plaintiff was given food, observed for a period of time, and discharged. Tr. 281-85.

Some hours later, Plaintiff's daughter brought Plaintiff to another emergency room following a reported seizure episode in which Plaintiff was found shaking on the floor at home. Plaintiff related that she had been placed on Dilantin some years ago but decided to stop taking it about two or three years ago, and until recently had not had any

problems. Plaintiff's daughter reported that Plaintiff had four similar seizures in the past month. A CT of Plaintiff's head was negative. Plaintiff was given Dilantin (300 mg) and was discharged. Tr. at 108-116.

On March 23, 1999, Plaintiff was brought to the hospital by ambulance after having a seizure at work. She had noticed some jerking of her extremities and then fell to the floor, awakening to find paramedics around her. The paramedics noted that initially Plaintiff was "postictal" but then became more alert after they were there for a period of time. Plaintiff stated that she was not on any anti-seizure medication. A sleep EEG was normal. Tr. at 277-80. On December 31, 1999, Plaintiff was again seen at a hospital after she had a seizure and hit her forehead on a laptop computer. The hospital notes indicate that Plaintiff had run out of Dilantin one week prior. The notes also indicate that Plaintiff had low blood sugar. Tr. at 169-70.

Plaintiff went to the hospital on June 21, 2000, due to a blunt head trauma sustained during a seizure. At this time she was prescribed Depakote, an anti-seizure medication. Hypoglycemia was noted. Tr. at 165-66. The medical record documents similar episodes on September 13, 2000 (Tr. at 162-64), when Plaintiff needed nine staples in her scalp due to hitting her head during a seizure, and on November 28, 2000 (Tr. at 156-58). On December 4, 2000, Plaintiff was examined by neurologist L. James Willmore, M.D., who told her that driving was forbidden and who switched her anti-seizure medication from Depakote to Dilantin (300 mg. daily), with Valium continued. Tr. at 128-30. An MRI dated February 12, 2001, of Plaintiff's brain indicated "diffuse

4

cortical and cerebellar atrophy." Tr. at 227.  An EEG, also conducted on February 12, 2001, was normal.  Tr. at 228.

The record documents continuing trips to the hospital following seizures on the following dates:  April 11, 2001 (Tr. at 152-53); June 3, 2001 (Tr. at 145-47); August 7, 2001 (Tr. at 137-39); August 29, 2001 (Tr. at 134-36); October 14, 2001 (Tr. at 131-33); and November 6, 2001 (Tr. at 239-41).  Notes from the August 29 and October 14 visits state that Plaintiff had been non-compliant with her medications; notes from the November 6, 2001 visit indicate that Plaintiff's tongue was swollen, as she had bitten it during a seizure the previous day.

Treatment notes of Douglas Parashak, M.D., dated November 5, 2001, state that Plaintiff came in after having not been seen for a year.   Plaintiff told Dr. Parashak that she had had two seizures, one three weeks ago and one one week ago.  Dr. Parashak noted as follows:

> She has been taking just Valium 10 mg.  Apparently she tried cutting back on this three times a day and started having seizures.  Somewhere along the line she stopped taking her Depakote, not sure exactly when but she doesn't remember taking it although when I saw her in October of 2000 she had been on the Depakote for a year and basically seizure free.  Spent some time talking to her that she needs to take the Depakote to maintain seizure free.  As she stabilizes on Depakote we can consider decreasing the Valium.

Plaintiff was to return in about two months.  Tr. at 241.

On May 3, 2002, consulting psychologist Barbara Sheedy, Ph.D., interviewed Plaintiff at the request of the Social Security Administration.  Plaintiff was then living in the Boston, Massachusetts area.  Plaintiff reported that she was having seizures

approximately twice a month and that she was currently taking Depakote 250 mg and Valium 5 mg, each three times a day.  Plaintiff told Dr. Sheedy that she used to be very intelligent but now she just felt as though she had no control over what was happening to her.  Plaintiff reported that she had left her job at the bank in November 2001after having had several seizures at work, one during which a customer caught her when she was falling.  She stated that she was not told that she had to leave the job, but that she could tell that her supervisors did not like the fact that she was having seizures at work.  She also reported that she was becoming "somewhat forgetful" and having more difficulty learning procedures if something changed.  Tr. at 172-73.

Plaintiff reported that she was separated from her husband, and that she had three children, ages 22, 15, and 14, the oldest and youngest of whom were living with her. Plaintiff stated that she was not currently driving due to her seizures.  She had a number of interests including rock and fossil hunting, but she now had to have someone go with her everywhere and her family did not share her interests.   Plaintiff was able to do laundry and housework, but did not use the stove because she and her family did not feel it was safe for her to do so.  Tr. at 173.

Dr. Sheedy found that Plaintiff was oriented to time, place, and person, and demonstrated very good speech and language.  According to Dr. Sheedy, there was no evidence of any psychiatric or mental disorder.  Plaintiff, however, continued to have seizures about twice a month and reportedly was reluctant to take more medication because it would make her too sleepy and unable to function.  Thus, although Plaintiff

was capable of "getting around the community independently" in terms of her intellectual skills, she now always had to have someone with her to make sure she did not hurt herself if she had a seizure. Dr. Sheedy found that Plaintiff's attention and concentration were generally intact, that her memory was within normal limits, and that she could follow directions and get along appropriately with co-workers and supervisors. Dr. Sheedy diagnosed Plaintiff's Global Assessment of Functioning (GAF) as 65-70.[1] Tr. at 174-75.

A non-examining psychologist, Kathryn Collins-Wooley, Ph.D., completed a Psychiatric Review Technique form on May 16, 2002. Dr. Collins-Wooley indicated that Plaintiff's impairment was not severe and that mild neurocognitive disorder should be considered (ruled out). The only functional limitations indicated as a result of Plaintiff's mental impairment was mild limitation in her activities of daily living and in maintaining concentration, persistence, or pace. Tr. at 177-88.

On May 30, 2002, Plaintiff was treated at the hospital for abrasions and contusions she sustained when she had a seizure while driving and hit a pole. The EMS driver reported that Plaintiff was mildly postictal at the scene. Plaintiff was directed not to drive until she was evaluated and cleared by a neurologist. Tr. at 193-200.

---

[1]     A GAF score represents a clinician's judgment of an individual's overall ability to function in social, school, or occupational settings, not including impairments due to physical or environmental limitations. Diagnostic & Statistical Manual of Mental Disorders (4th ed.) (DSM-IV) at 32. GAF scores of 41 to 50 reflect "serious" difficulties in social, occupational, or school functioning; scores of 51-60 indicate "moderate" difficulties in these areas; scores of 61-70 indicate "mild" difficulties.

On July 2, 2002, consultant David Cohen, M.D., examined Plaintiff at the agency's request. He noted that according to the Plaintiff's account, she did not follow through with medical treatment and had no local doctor although she had been living in Massachusetts for about six months. Dr. Cohen observed that Plaintiff was alert and oriented, with intact speech and language. Noting that he did not have Plaintiff's medical records to review, he commented, "[c]linical neurological view at the present time is free of any objective sign of focal neurologic dysfunction, obstructive intracranial disease." Dr. Cohen believed that Plaintiff needed adjustment and monitoring of her antiepileptic therapy. Tr. at 206-08.

On September 18, 2002, Plaintiff went to Conrad Mark, M.D., for treatment of her seizures. Dr. Mark reviewed Plaintiff's history of past and present seizures, as reported to him by Plaintiff. On examination, Plaintiff was alert, fluent, attentive, and oriented, and had good comprehension and no difficulty with word-finding. Dr. Mark questioned whether Plaintiff's Depakote level was therapeutic. He increased her Depakote to 250 mg four times a day, adding that he was unable to provide any Valium because it was the policy of the office not to provide any habit-forming medication. Tr. at 225-26. An MRI of Plaintiff's brain ordered by Dr. Mark was performed on September 28, 2002, with normal results; an intracranial MR angiogram ordered by Dr. Mark was performed on September 30, 2002, with normal results; and an EEG ordered by Dr. Mark was performed on October 11, 2002, with normal results. Dr. Mark's notes from December 11, 2002, are somewhat illegible, but include the notation "underlying congenital brain

abnormality." He increased her prescription of Depakote to 250 mg five times a day. Tr. at 219-24.

A physical RFC assessment completed by medical consultant M. Lipski, M.D., on February 19, 2003, based upon a review of the record, stated that Plaintiff was assessed as having a seizure disorder with an underlying congenital brain abnormality, and that the seizures were expected to be controlled with continual follow-up and adherence to a medical regimen. The only noted limitation on Plaintiff's physical abilities was that she needed to avoid even moderate exposure to hazards such as machinery and heights. Tr. at 229-36.

On May 21, 2004 (the date of the hearing), Plaintiff listed her current medications as Depakote (750 mg. daily) and Valium (15 mg.) daily, both first prescribed in 1998 by Dr. Parashak. Tr. at 296.

**Evidentiary Hearing of May 21, 2004**

Plaintiff, who was represented by counsel at the evidentiary hearing (held in Boston), testified that she had not had a regular place of residence for the past four or five months, and alternated between living with her ex-boyfriend and a daughter, having lived on the streets for a period of time during the current year. She testified that she was 46 years old, had some college, and had worked in a bank for 25 years, starting as a teller, moving up to head teller, and then to loan officer and assistant manager. Plaintiff testified that she dealt with the public every day in her past work. She testified that she did not have any current income; that she was not currently receiving any medical

treatment, beyond getting her medications refilled, because she could no afford it; and that she had to borrow money for these medications.  She stated that during the past year, she went without medication for a few months as she could not find anyone from whom to borrow the money.  Tr. at 327-32.

Plaintiff testified that she had enjoyed her work and left her last job because she was having seizures at work and "they didn't like it."  According to Plaintiff, her seizures were first thought to be hypoglycemia seizures, and so she was put on a special diet, but when that did not help, she was sent to a neurologist and was told that the lobes in her brain weren't formed properly.   Plaintiff stated that she currently had seizures at least once a day, which was worse than when she was working and would have seizures about four times a month.  Plaintiff testified that according to the accounts of others, she would yell or jerk before the onset of a seizure, and that a seizure would last for about four or five minutes, during which time she was unconscious and incontinent.  Plaintiff testified that after a seizure, she was "indisposed" for about four hours because she could not think straight.  She had broken her toes several times from jerking around during a seizure and had bitten her tongue so many times that "both sides are missing pieces of tongue."  Tr. at 331-35.

Plaintiff testified that she was taking Depakote three times a day and that it made her tired all the time.  She stated that her seizure condition began in 1998, and acknowledged that sometimes while she was still working she did not take her medication because if she did, she could not do her job.  ("I couldn't even add numbers sometimes.")

10

Plaintiff testified that she was not permitted to drive, and that she did not usually go out alone, and that if she did, it was for a short distance and she would tell someone where she was going. She did not go grocery shopping because she had no money, and she stopped cooking after she once spilled hot oil on herself. Plaintiff claimed that she slept most of the day. Tr. at 335-39.

Plaintiff testified that she was taken to the emergency room on numerous occasions when she was having a seizure, but that she told people not to take her anymore, as the seizure would have passed by the time she got to the hospital. She stated that Dr. Parashak checked her Depakote level and that he said he might increase it. Plaintiff was hoping to have a new test done to better identify her seizure problem, and then perhaps rectify it or give her different medications. Tr. at 339-41.

Medical expert Gerald Winkler, M.D., who had been present during Plaintiff's testimony, was asked whether he thought, based upon his review of the record, that Plaintiff's seizure disorder met the listing for epilepsy in the Commissioner's listing of impairments that are deemed disabling (Appendix 1 of 20 C.F.R., Part 404, Subpart P, listing 11.02 - convulsive epilepsy). Dr. Winkler testified that the three normal EEGs of March 1999, February 2001, and December 2002, did not mean that Plaintiff did not have epilepsy, but did mean that EEGs did not provide confirmation of such a diagnosis. Dr. Winkler further stated that Plaintiff's CT and MRI results, showing some enlargement of the ventricles of the brain, diffuse atrophy of the cerebral cortex and cerebellum, and minor developmental abnormality of the lower end of the cerebellum (the balance portion

of the brain), did not correlate with a seizure disorder. He noted that epilepsy is very hard to diagnose and that 50 percent of people who go to specialized epilepsy centers turn out not to have an epileptic seizure disorder. Tr. at 341-43.

Dr. Winkler noted that one of the criteria of listing 11.02 was that the claimant take medication as prescribed for three months, but that the medical evidence showed below therapeutic levels on June 21, 2000, November 28, 2000, and May 30, 2002; and that on October 14, 2001, and November 5, 2001, Plaintiff had reported that she had stopped taking her anti-seizure medication. Dr. Winkler concluded that, in light of the "questionable issues regarding medication compliance" and absence of EEG confirmation, Plaintiff did not meet or medically equal listing 11.02, or listing 11.03 (nonconvulsive epilepsy). Tr. at 343-44.

Dr. Winkler testified that a dose of 750 mg of Depakote a day was a reasonable dose for a seizure disorder, but that it did not always work. He further testified that Depakote, like many anti-seizure medications, caused sedation, "but if it is a constant problem, there are other choices that can be made. One doesn't just have to accept that without some effort at improving the situation." Dr. Winkler stated that Plaintiff's description of a seizure episode was consistent with, but was not diagnostic of, a grand mal seizure. Tr. at 344-46.

A psychiatric medical expert, Alfred Jonas, M.D., testified that a "good deal more information" was required, beyond the scope of his asking Plaintiff a few questions, to determine if she met a listed mental impairment. The ALJ responded, "I tend to agree. I

12

think this case screams for psychiatric evaluation." The ALJ stated that his hands were "completely tied" with regard to the listing for epilepsy without objective medical evidence, but that he thought "we're approaching it from the wrong impairment." He accordingly, asked Plaintiff to undergo a psychiatric evaluation and stated that he would make his determination on the basis of that report, or schedule a supplemental hearing. Tr. at 346-47.

## Post-hearing Evidence

On June 24, 2004, Jason Mondale, M.D., conducted a psychiatric consultative examination of Plaintiff at the direction of the ALJ. Dr. Mondale reported that Plaintiff exhibited mild to moderate sedation due to medications and a seizure disorder, and that she required some effort to focus on tasks. In a medical source statement of ability to do work-related activities, Dr. Mondale indicated that Plaintiff had marked limitation in her ability to understand or remember detailed instructions, and to respond appropriately to changes in a routine work setting; and moderate limitations in her ability to carry out detailed instructions, interact appropriately with the public, supervisors, and co-workers, and respond appropriately to usual work pressures. Tr. at 297-300.

## ALJ's Decision of November 22, 2004

The ALJ highlighted the medical record, noting Dr. Mondale's report, among others. The ALJ found that the medical evidence indicated that Plaintiff had a seizure disorder, which was a "severe" impairment, within the meaning of the Commissioner's regulations (significantly limiting a claimant's physical or mental ability to do basic work

activities), but not one that met or medically equaled a listed impairment. The ALJ

proceeded to consider whether Plaintiff retained the RFC to perform her past relevant

work. The ALJ noted that in making this assessment he had to consider all symptoms,

including pain, and the extent to which these symptoms "could reasonably be accepted as

consistent with the objective medical evidence," other evidence, and medical opinions.

Tr. at 24.

The ALJ noted that while the evidence indicated that Plaintiff had adverse side

effects from her medications, it was unclear who was prescribing those medications. He

stated that Plaintiff was not currently under any treatment for any impairment. Although

Plaintiff reported that Dr. Parashak had prescribed Depakote and Valium, there were no

treatment records from Dr. Parashak since July 23, 2003. Furthermore, Dr. Parashak

practiced in St. Louis, Missouri, whereas Plaintiff testified that she had lived in

Massachusetts for over two years, and the record did not contain any evidence that a

physician in Massachusetts had prescribed Valium. The ALJ pointed to Dr. Mark's

comment on September 18, 2002, that he told Plaintiff that it was the policy of the office

not to prescribe any habit-forming medications. In addition, the record showed

noncompliance with prescribed treatment.

The ALJ found that Plaintiff's testimony that she had seizures every day was

inconsistent with the objective medical evidence. The ALJ believed that if a person were

experiencing seizures on a daily basis, she would seek medical treatment at a hospital or

from a physician, yet Plaintiff's record did not show any consistent treatment for any

impairment.  The ALJ also stated that while Plaintiff testified that she did not have health insurance, the record showed that she had health insurance provided by her ex-husband. Tr. at 24-25.

The ALJ additionally found that Plaintiff's daily activities, which she reported as reading, watching television, doing light household chores, going shopping, driving a car, using public transportation, and enjoying float trips, rock and fossil hunting, fishing, and sightseeing, did not support her allegations of disability.  The ALJ did add that Plaintiff stated that she now needed to go places with someone because of her seizure disorder. Tr. at 25.

The ALJ found that Plaintiff had the physical RFC to lift and/or carry over 50 pounds frequently, and to sit and stand and/or walk for up to eight hours in an eight-hour workday with normal breaks, but that she needed to avoid concentrated exposure to hazards and dangerous moving machinery, because of seizures.  The ALJ concluded that based upon this RFC, Plaintiff could return to her past relevant work as a bank teller and bank customer service representative, as that work did not require her to lift more than 20 pounds or perform tasks around unprotected heights or dangerous machinery and was performed at the sedentary to light exertional level.   Accordingly, the ALJ found that Plaintiff was not under a disability, as that term is defined in the Social Security Act.  Id.

**Post-Decision Evidence**

As noted above, on March 17, 2005, while her request for review was pending before the Appeals Council, Plaintiff's counsel wrote to the Council that Plaintiff had

been misdiagnosed until recently, and that following surgery on January 7, 2004, for a

ruptured eardrum, and then treatment for an ear infection, her problems had resolved.

Plaintiff's counsel wrote that her seizures had "decreased markedly" since her ear

infection had been partially treated in November 2004. Plaintiff amended her application

to seek a period of disability from November 2001 through February 1, 2005. Tr. at 316-

17. She submitted hospital records consisting of a "Patient Instructions for Follow-up

and Home Care" form from St. Louis University Hospital dated October 9, 2004,

showing a diagnosis of right otitis externa and right otitis media (an infection of the ear

canal); a similar form dated February 10, 2005, showing a diagnosis of angio edema; and

slips for the following prescription medications: amoxicillin (10/9/04), neo/poly/HC 1%

otic solution (10/9/04), Floxin 0.3% otic solution (10/14/04), Cresylate otic solution

(11/22/04), Methylprednisolone (anti-inflamatory drug) (2/20/05), Evoclin (acne-fighting

antibiotic) (2/16/05). Tr. at 319-23. The Appeals Council summarily denied Plaintiff's

request for review. Tr. at 10-13.

## DISCUSSION

### Standard of Review and Statutory Framework

In reviewing the denial of disability benefits, a court must affirm the

Commissioner's decision "so long as it conforms to the law and is supported by

substantial evidence on the record as a whole." Reed v. Barnhart, 399 F.3d 917, 920 (8th

Cir. 2005) (quoted case omitted). This "entails 'a more scrutinizing analysis'" than the

substantial evidence standard. Id. (quoting Wilson v. Sullivan, 886 F.2d 172, 175 (8th

Cir. 1989)).  The court's review "'is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision; [the court must] also take into account whatever in the record fairly detracts from that decision.'" Id. (quoting Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001)).  Reversal is not warranted, however, "'merely because substantial evidence would have supported an opposite decision.'"  Id. (quoting Shannon v. Chater, 54 F.3d 484, 486 (8th Cir.1995)).

In order to qualify for Social Security disability benefits, a plaintiff must demonstrate an inability to engage in any substantial gainful activity by reason of a medically determinable impairment which has lasted or can be expected to last for not less than 12 months.  42 U.S.C. § 423(d)(1)(A); Barnhart v. Walton, 535 U.S. 212, 217-22 (2002) (both the impairment and the inability to engage in substantial gainful employment must last or be expected to last not less than 12 months).

To determine whether a claimant is disabled, the Commissioner employs a five-step evaluation process.  First, the Commissioner decides whether the claimant is engaged in substantial gainful activity.  If so, disability benefits are denied.  If not, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, defined in 20 C.F.R. § 404.1520(c) as an impairment which significantly limits an individual's physical or mental ability to do basic work activities.

If the claimant's impairment is not severe, disability benefits are denied.  If the impairment is severe, the Commissioner determines at step three whether the claimant's impairment meets or is equal to one of the impairments listed in Appendix 1 (20 C.F.R.,

Pt. 404, Subpt. P). If the claimant's impairment is equivalent to one of the listed impairments, the claimant is conclusively presumed to be disabled. If the impairment is one that does not meet or equal a listed impairment, the Commissioner asks at step four whether the claimant has the RFC to perform his or her past relevant work.

If the claimant is able to perform his or her past relevant work, he or she is not disabled. If the claimant cannot perform his or her past relevant work, step five asks whether the claimant has the RFC to perform work in the national economy in view of his or her age, education, and work experience (vocational factors). If not, the claimant is declared disabled and is entitled to disability benefits. 20 C.F.R. §§ 404.1520(a)-(f); Fastner v. Barnhart, 324 F.3d 981, 983-84 (8th Cir. 2003).

**ALJ's Determination of Plaintiff's RFC**

Plaintiff argues that there is no medical evidence to support the ALJ's assessment of Plaintiff's RFC, and that the ALJ improperly failed to factor into the RFC Dr. Mondale's report, which indicated that secondary to medication Plaintiff had been taking during the period in question, she had moderate and marked limitations in several work-related areas of functioning. In a related argument, Plaintiff asserts that the ALJ did not consider Plaintiff's subjective complaints under the proper standard.

A disability claimant's RFC is the most he or she can still do despite his or her limitations. 20 C.F.R. § 404.1545(a)(1). In McCoy v. Schweiker, 683 F.2d 1138 (8th Cir. 1982) (en banc), the Eighth Circuit defined RFC as the ability to do the requisite work-related acts "day in and day out, in the sometimes competitive and stressful

conditions in which real people work in the real world." Id. at 1147. The ALJ's determination of an individual's RFC should be "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)).

Before determining a claimant's RFC, the ALJ must evaluate the claimant's credibility with respect to the severity of his limitations. Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001). In Polaski v. Heckler, 739 F.2d 1320, 1332 (8th Cir. 1984), the Eighth Circuit held that the "absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints." The ALJ must also consider "observations by third parties and treating and examining physicians relating to such matters as (1) the claimant's daily activities; (2) the frequency, duration, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions." Id.

"If the ALJ discredits a claimant's credibility and gives a good reason for doing so, [the court] will defer to [his] judgment even if every factor is not discussed in depth." Dunahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001). "A disability claimant's subjective complaints of [symptoms] may be discounted if inconsistencies in the record as a whole bring those complaints into question." Gonzales v. Barnhart, 465 F.3d 890, 895 (8th Cir. 2006).

Here, the Court find a serious deficiency in the ALJ's assessment of Plaintiff's RFC due to the ALJ's failure to factor in any limitation, aside from the need to avoid heights and dangerous machinery, resulting from Plaintiff's seizures and medication side effects. Most puzzling is the ALJ's failure to consider Dr. Mondale's report, other than to briefly summarize it. After stating that the case "screamed" for a psychiatric evaluation and ordering one, the ALJ did not explain what weight he thought this evaluation should be accorded and why. As noted above, Dr. Mondale found that Plaintiff had moderate limitations in some work related activities and marked limitations in others. With the limitations found by Dr. Mondale, the question is raised whether Plaintiff could have performed her past work as a bank teller or customer service representative.

The Commissioner's position before the Court on this matter is as follows:

> To the extent that the consultative opinion would limit Plaintiff further than the ALJ's RFC, it is not entitled to controlling weight. First, the consultative examiner did not indicate that Plaintiff's condition would last the required duration for disability purposes, 12 months. Second, and more importantly, a one-time evaluation by a non-treating psychologist is not entitled to controlling weight.

Br. at 8. The issue, however, is not the ALJ's failure to give Dr. Mondale's report controlling weight, but the ALJ's failure to give it any weight at all and failing to explain why. Upon observing Plaintiff's demeanor at the hearing, something this Court cannot do, the ALJ clearly thought there was a non-exertional component to Plaintiff's

impairments. The Court concludes that, under the circumstances, it was reversible error for the ALJ not to explain why he did not give any weight to Dr. Mondale's report.

On remand, the ALJ should also examine and evaluate the impact of the evidence submitted to the Appeals Council which the Council did not mention in denying Plaintiff's request for review. The ALJ found that Plaintiff's seizures (whatever their etiology) constituted a severe impairment in that they significantly limited her ability to do basic work activities. The ALJ found the seizures were not disabling, however, based in part on the fact that Plaintiff had been noncompliant with her medications.

Reliance on Plaintiff's non-compliance with her medications is somewhat troubling for two reasons. First, although the matter is not entirely free from doubt, the record indicates that during at least part of the period in question -- from Plaintiff's alleged disability onset date (November 2001) until the date Plaintiff asserts the seizure problem was resolved (February 1, 2005) -- Plaintiff was having seizures even though she was taking anti-seizure medications. She testified that she would stop taking the medications because they made her too drowsy to work. Second, the new evidence, suggesting the true cause of Plaintiff's seizures, raises a question as to the efficacy of the prescribed medications in any event. Medical testimony may be necessary on the issue of whether the medication would have had any effect, given what is now known about Plaintiff's condition. As noted, the Appeal Council failed to address the impact of the new evidence before it with regard to Plaintiff's seizures. On remand, this evidence should be considered and evaluated by the ALJ.

## <u>CONCLUSION</u>

The Commissioner's decision that Plaintiff was not disabled for any 12-month period between November 2001 and February 1, 2005, is not supported by substantial evidence on the record as a whole.  Upon remand, the ALJ is to specifically address Dr. Mondale's report of June 24, 2004, and the evidence that Plaintiff submitted to the Appeals Council with regard to her seizures.

Accordingly,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be **REVERSED** and the case **REMANDED** for further consideration.

The parties are advised that they have eleven (11) days to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.

_____
AUDREY G. FLEISSIG
UNITED STATES MAGISTRATE JUDGE

Dated on this 12th day of December, 2006.